MaddeN, Judge,
delivered the opinion of the court:
The plaintiff sues to recover alleged excess costs which, it says, it incurred in the performance of a construction contract with the Government. It says that the Government issued its notice to proceed, thereby starting the contract performance period to run, some four months before the worksite was available. The Government refused to extend the time for performance, in spite of the alleged unavailability of the worksite, and, the plaintiff claims, it was thereby required to make use of overtime, Sunday and holiday labor, and to use extra equipment, in order to complete the contract on time.
The Government defends on the grounds that the worksite was in fact available, that the plaintiff of its own choice delayed the beginning of its performance, and that, in any event, the plaintiff is bound by the decisions, adverse to it, of the contracting officer and the Corps of Engineers Board of Contract Appeals.
The contract in question, executed in November, 1949 was for the construction of a 270,000 kilowatt hydroelectric power plant and adjoining switchyard facilities at Wolf Creek on the Cumberland River in Kentucky. The Wolf Creek dam and power station are an important unit in the plan of development of the Cumberland River Basin, and in the overall plan for the development of the Ohio and Mississippi River systems. The dam of the project, and also the substructure of the powerhouse and the cable tunnel in the switchyard adjoining the power plant, were the subject of another contract, let in 1946, to joint venturers, herein called Jones-Wright, which contract was nearing completion at the time involved in this case. The alleged delay of Jones-Wright in completing its work in the powerhouse substructure and the switchyard area was the cause, the plaintiff claims, of the unavailability of the worksite to the plaintiff.
Bids for the contract here in question were invited by the Corps of Engineers on August 15,1949. The work included the placement of some 40,000 cubic yards of concrete and *301 the installation of many units of heavy and complicated equipment, including six turbines weighing some 650 tons each. Much of this equipment was to be furnished by the Government, or by other persons.
The plaintiff’s president, Mr. Albrecht, and its vice-president, Mr. Fry, inspected the site on several occasions prior to submitting the plaintiff’s bid. They saw that Jones-Wright had not completed its work on the powerhouse substructure nor on the cable tunnel. They made no inquiry and the Government’s representatives made no statement as to when the Jones-Wright work would be far enough along to make the worksite of the new proposed contract available. The proposed contract contained the usual article requiring the cooperation of the contractor with other contractors on the worksite.
The plaintiff submitted its bid on October 27,1949, and on November 3 it was awarded the contract, its bid of $5,558,719 being the low bid by a considerable margin. After the correction of an inadvertent error in the contract, the plaintiff signed it on November 21. Before the signing, the plaintiff’s officials had again inspected the site and were aware that the Jones-Wright work had progressed very slowly.
On November 22,1949, the Government issued to the plaintiff its notice to proceed within ten days, which notice was received by the plaintiff on November 25. By the terms of the contract the plaintiff had 1,230 calendar days from November 25, 1949, i.e., until April 8, 1953, to complete the contract. On or about November 23, 1949, the plaintiff furnished the Government a preliminary progress curve study which provided for (a) a mobilization period of 130 days expiring April 4, 1950; (b) the first contract work to be done on the powerhouse substructure about March 5, 1950; and (c) the first contract work to be done leading to the installation of turbines and generators on April 5,1950. We have made a finding that one reason for the rather long mobilization period proposed by the plaintiff was its disinclination to take over the powerhouse site, even if it had been available, prior to the end of winter weather and the period when floods could be expected.
*302 During December 1949, the plaintiff placed orders for material and equipment, negotiated subcontracts, and contracted for the installation of public utility connections. In letters of February 7 and 10, 1950, to the Government, the plaintiff proposed a revised work progress schedule which provided for starting of concrete placement in late April and commencement on May 1 of work on installation of pen-stock extensions in the powerhouse, and work in the switch-yard. This schedule showed dates about one month later than those named in the plaintiff’s proposed progress curve submitted on November 23, 1949. The reasons were that in January and early February 1950, there had been two floods which had made work impossible in the powerhouse substructure, and that it had developed that the concrete plant ordered by the plaintiff would not be delivered on time.
On March 1 the Government turned over to the plaintiff for its use and responsibility the powerhouse substructure, advising that the Jones-Wright work there was completed except for the removal of some items of equipment and material and the performance of certain items of repairing and finishing. The plaintiff was also orally advised that it was behind schedule in its work and was summoned to a conference to be held on March 6. On March 3, the plaintiff wrote a letter to the Government protesting the turning over of the substructure to it because the Jones-Wright work in it had not been completed, and because the switchyard area had not been backfilled to grade and therefore the plaintiff had not been able to build an access road from the plaintiff’s campsite to the powerhouse. It also said that the failure to backfill and grade the switchyard area was delaying the plaintiff in the erection of its shops and warehouses.
At the conference on March 6 the contracting officer stated that the Government had made binding commitments to the Tennessee Valley Authority and the Atomic Energy Commission for an early supply of electricity from the new power plant and that no delay in the contract completion dates for the first two generator units could be permitted. The contracting officer gave the plaintiff a proposed revised work schedule which set an October 15, 1950, date for the comple *303 tion of the site for the erection of generator No. 6. The plaintiff protested the revised work schedule, stating reasons why it did not need to be accelerated so greatly. The concrete plant ordered by the plaintiff on December 23, 1949, was, because of a strike, delivered so late that it was not in operation until June 6, 1950, though it had been scheduled to be in operation by May 1. The contracting officer granted the plaintiff a 37-day extension of time on this account. The plaintiff needed concrete on and after May 3, received permission from the contracting officer on May 16 to purchase concrete from Jones-Wright, but did not purchase any because its own plant was soon to be ready for operation.
Jones-Wright had filled the switchyard area up to grade by April 15, 1950, and the plaintiff could then have built its access road from its campsite to the powerhouse. It did not begin to build the road until after May 11, and did not finish it until June 2. At the time the plaintiff made its bid, the Jones-Wright contract provided for completion of all of the Jones-Wright work, including the cable tunnel, by March 30,1950. Until the cable tunnel had been completed, the plaintiff could not have done its erection work in the switchyard area, since that work was to be placed on top of or in close relation to the tunnel.
The plaintiff, as we have seen, claims that the Government wrongfully issued its notice to proceed at a time when the worksite for the plaintiff’s work was not accessible. It does not claim to have been damaged by reason of assembling, because of the notice, men and equipment which stood idle because the worksite proved to be unavailable. It claims only that the notice shortened the contract period and thereby compelled the plaintiff to make extraordinary expenditures to finish its work within the shortened work period. The plaintiff must, we suppose, persuade us that it was ready and willing to get to work in the substructure of the powerhouse and in the switchyard and was, against its will, prevented from doing so by the uncompleted work of Jones-Wright.
The plaintiff, in its petition, claims that it should have had access to the substructure by December 5. On Novem- *304 her 23, without any protest or suggestion of dissatisfaction, it set the date as March 5, 1950. If it had wanted to get at its work sooner than that, it would have requested and urged the Government, or Jones-Wright, or both, to expedite the work and get out of its way. No doubt during the floods in January and early February it was quite content not to be in the substructure, and not to have the responsibility and expense of cleaning out the debris and mud deposited by the floods.
The plaintiff claims that it was harmed by not having its own access road from its campsite to the powerhouse, because of the tardiness of Jones-Wright in filling and grading the switchyard over which the access road was to be built. As we have seen, the grading was done by April 15, but the plaintiff did not begin to build its road until after May 11, and did not complete it until June 2. This is.not the conduct of one who is ready and anxious to get ahead but is being held back against his will. The plaintiff claims that it was harmed, again by the delay in the grading of the campsite, because, among other things, it could not construct the foundation for its cement mixer. Because of a strike for which neither party was responsible, the cement mixer was not delivered to the job until long after the grading had been finished. If the plaintiff had been anxious to proceed with placing cement before it finished its access road, it could have bought cement from Jones-Wright, yet it did not do so.
Our conclusion is that the plaintiff had access to its work-site substantially as soon as it wanted it and could-make use of it, and cannot fairly charge the Government with delaying its work.
As to the floods, of course the Government is not chargeable with breach of contract because they occurred. The plaintiff says that, under Article 9(c) of the contract, it was entitled to an extension of time because of the unanticipated occurrence of the second flood. The evidence however shows that the occurrence of two floods in one winter was not unusual on the Cumberland Eiver.
The parties have discussed at length the weight which the court should give to the decision, adverse to the plaintiff, of the contracting officer, affirmed by the Board of Contract *305 Appeals. Tbe instant contract provided finality for such a decision, and the Wunderlich Act of May 11,1954, 68 Stat. 81, 41 U.S.C., (1952 ed. supp. II), § 321, confirms such finality unless the decision is
fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence.
The plaintiff’s attack upon the administrative decision here is upon the ground that it is not supported by substantial evidence. Since we think it is so supported, both on the record before the contracting officer and the board, and on the record before this court, it is not necessary to discuss the question mooted in Volentine and Littleton v. United States, 136 C. Cls. 638, and Fehlhaber v. United States, 138 C. Cls. 571, cert. denied 355 U.S. 877.
The plaintiff’s petition will be dismissed.
It is so ordered.
Eahy, Circuit Judge, sitting by designation; Laramore, Judge; Whitaker, Judge, and Jones, Chief Judge, concur.
ÍTNDINGS OE PACT
The court, having considered the evidence, the report of Trial Commissioner C. Murray Bernhardt, and the briefs and argument of counsel, makes findings of fact as follows:
1. In its petition plaintiff asks judgment for certain excess costs sustained in its performance of a construction contract arising from defendant’s alleged failure to make the work-site available to plaintiff for approximately four months after the receipt of the notice to proceed, without the grant of a compensating extension of time for performance, thereby compressing the actual performance period and requiring a costly and uncompensated acceleration of activity by plaintiff in order to meet the contract completion date. In addition to other defenses, the defendant relies on the finality of the findings of the Contracting Officer as affirmed on appeal by the Corps of Engineers Claims and Appeals Board. The contract in question was let in late 1949 for the completion of a 270,000 kilowatt hydroelectric powerplant and "adjoining switchyard facilities at Wolf Creek on the *306 Cumberland River in Kentucky. The Wolf Creek dam and power station together constitute an important unit in the plan of development of the Cumberland River Basin, itself part of an overall plan for the development of the Ohio and Mississippi River systems. A contract for the dam itself, the substructure of the powerhouse, and the cable tunnel in the switchyard adjoining the powerplant, had been let in 1946 to joint venturers herein referred to as Jones-Wright and, at the time of the contract in suit, was nearing completion. It was completed in August 1951. Another prime contract had been let in 1948 to the General Electric Company to furnish and erect (i. e., assemble and install) six generators in the powerhouse at a certain stage of plaintiff’s contract performance. The alleged delay of Jones-Wright in completing its work in the powerhouse substructure and the switchyard area to permit plaintiff’s access to the worksite is said by plaintiff to be the precipitating cause of its excess costs and the present-claim.
2. Plaintiff E. J. Albrecht Company is an Illinois corporation having its principal office and place of business in Chicago, Illinois. Plaintiff has for many years been engaged in the general contracting business and has performed many large construction contracts both for the defendant and others. E. J. Albrecht is the president of the plaintiff corporation. The vice-president of the corporation at all times pertinent to this case was Berwyn J. Fry, who was the plaintiff’s superintendent in charge of the performance of the contract in suit until just before its completion.
3. On August 15, 1949, the IT. S. Corps of Engineers at Nashville, Tennessee, issued to prospective bidders an Invitation for Bids, with accompanying specifications, for the completion of the Wolf Creek powerhouse and switchyard transmission facilities referred to in finding 1.. The work involved the placement of approximately 40,000 cubic yards of concrete, a large amount of architectural work, and the installation of a quantity of heavy and complicated mechanical and electrical equipment, including six turbines weighing approximately 650 tons each. Much of the equipment was furnished by the defendant and all of it, except six generators which were the responsibility of the General Electric Company, was to be installed by the plaintiff..
*307 4. Messrs. Albrecht and Fry inspected the site on several occasions prior to submitting plaintiff’s bid. On these occasions they observed that Jones-Wright had not yet completed its work on the powerhouse substructure and the switchyard cable tunnel. As to the former, the work remaining in the substructure at the time of plaintiff’s bid consisted largely of cleanup and minor repairs which could have been completed in a few weeks’ time if diligently pursued. As to the cable tunnel, in late September 1949 the concrete foundations and forms were in their early stages. Until the vertical walls of the cable tunnel were erected Jones-Wright would be unable to backfill the adjoining switchyard area over to the river bank, which it was obligated by its contract to do. Until the backfill was completed and the switchyard area between the cable tunnel and the river brought up to grade, the plaintiff could not make use of the most convenient and efficient means of access into the powerhouse substructure where its first “pay” work would logically be performed, for the plaintiff’s planned access road from its selected campsite into the powerhouse substructure would necessarily lead across the riverward side of the switchyard area when the latter was brought to grade. At the time of plaintiff’s bid the completion date for Jones-Wright’s contract was March 30,1950. In the course of their inspections of the site prior to contract award, plaintiff’s representatives made no inquiry as to when the Jones-Wright work would reach a stage to provide suitable access to the site for plaintiff’s proposed operations, and defendant’s engineers vouchsafed no information.
5. Plaintiff submitted its bid on October 27, 1949. Comparison of its bid with other responsible bids indicates that, while plaintiff’s bid for the overall contract was substantially lower than those of its competitors, that part of it representing work to be performed by plaintiff itself, excluding items subcontracted to others, was closely in line with the bid of the next lowest bidder and with the defendant’s prebid estimate on comparable items.
6. On November 3,1949, contract No. DA-40-058-ENG-29 was awarded to plaintiff on its low bid of $5,558,719. In its proffered form the contract omitted a provision giving plain *308 tiff the use of the overhead traveling crane to be installed in the powerhouse, which had conditioned plaintiff’s bid. Article 29 was added to the contract to correct the omission and plaintiff signed and returned the contract to the Engineers on November 21, 1949. In the interim between the award and the signing Messrs. Fry and Albrecht again inspected the site and were familiar with the status of the Jones-Wright work in the powerhouse and switchyard, which had progressed very slowly, but were not familiar with the fact that, on November 18, Jones-Wright had been given change orders for additional work on the cable tunnel and had had its overall contract completion time extended to March 31,1951. It is not believed that the additional work ordered on the cable tunnel would take more time, and the time extension related not specifically to this work but applied to Jones-Wright’s entire contract performance time. Whether this overall extension caused Jones-Wright to relax in its finishing of the cable tunnel and backfilling of the switchyard area is conjectural. The defendant had earlier recognized that the backfilling of the cable tunnel area in the switchyard should be completed prior to the award of the contract to plaintiff.
7. The following excerpts from the contract and specifications are pertinent to the issues:
CONTRACT
ARTICLE 1. * * *
The work shall be commenced within ten (10) calendar days after receipt of notice to proceed and shall be completed not later than 1,230 calendar days after receipt of said notice to proceed.
*****
article 3. Changes. — The contracting officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. Any claim for adjustment under this article must be asserted within 10 days from the date the change is ordered: Provided, however, That the contracting of *309 ficer, if be determines that the facts justify such action, may receive and consider, and with the approval of the Secretary of the Army or his duly authorized representative, adjust any such claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in aRticle is hereof. But nothing provided in this article shall excuse the contractor from proceeding with the prosecution of the work so changed.
* * * * *
article 5. Extras. — Except as otherwise herein provided, no charge for any extra work or material will be allowed unless the same has been ordered in writing by the contracting officer, and the price stated in such order. $ $ $ $ $
ARTICLE 9. * * *
(c) Time Extension. — The right of the contractor to proceed shall not be terminated as provided in this article, nor the contractor charged with liquidated or actual damages, because of any delays in the completion of the work due to causes which he could not reasonably have anticipated and which were due to causes beyond his control and without his fault or negligence, including, but not restricted to, acts of God, or of the public enemy, acts of the Government, either in its sovereign or contractual capacity, acts of another contractor in the performance of a contract with the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargo, and unusually severe weather, or delays of subcontractors due to such causes; provided, however, that the contractor shall promptly notify the contracting officer in writing of the causes of such delay. Upon receipt of such notification the contracting officer shall ascertain the facts and the extent of such delay and, if in his judgment the facts so justify, shall extend the time for completing the work commensurate with the period of excusable delay. The contracting officer’s findings of fact thereon shall constitute his decision which shall be final and conclusive on the parties hereto subject to appeal by the contractor within thirty (30) days therefrom as provided in the “Disputes” Article herein.
‡ j|c s3« *
article 13. Other Contraéis. — -The Government may award other contracts for additional work, and the contractor shall fully cooperate with such other contractors and carefully fit his own work to that provided under *310 other contracts as may be directed by the contracting officer. The contractor shall not commit or permit any act which will interfere with the performance of work by any other contractor.
‡ ‡ •i* <t" $
ARtiole is. Disputes. — Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the contracting officer subject to written appeal by the contractor within 30 days to the Head of the Department concerned or his duly authorized representative whose decision shall be final and conclusive upon the parties hereto. In the meantime the contractor shall diligently proceed with the work as directed.
* # =i= * N=
PART II. GENERAL CONDITIONS
* * * * *
GC-3. SITE INVESTIGATION AND REPRESENTATIONS.— The contractor acknowledges that he has satisfied himself as to the nature and location of the work, the general and local conditions, particularly those bearing upon transportation, disposal, handling and storage of materials, availability of labor, water, electric power, and roads, uncertainties of weather, river stages, tides or similar physical conditions at the site, the conformation and condition of the ground, the character, quality and quantity of surface and subsurface materials to be encountered, the character and equipment and facilities needed preliminary to and during the prosecution of the work and all other matters which can in any way affect the work or the cost thereof under this contract. Any failure by the contractor to acquaint himself with all the available information concerning these conditions will not relieve him from responsibility for estimating properly the difficulty or cost of successfully performing the work. The Government assumes no responsibility for any understanding or representations made by any of its officers or agents during or prior to the negotiation and execution of this contract, unless (1) such understanding or representations are expressly stated in the contract and (2) the contract expressly provides that responsibility therefor is assumed by the Government. [Representations made but not so.expressly stated and for which liability is not expressly assumed by the Government in the contract shall be deemed only for the infor *311 mation of tbe contractor and tbe Government will not be liable or responsible therefor.
íjí ijs 4*
GC-5. PROGRESS CHARTS AND REQUIREMENTS EOR OVERTIME WORK.
íjí & * #
(b) Tbe contractor shall furnish sufficient forces, construction plant and equipment, and shall work such hours, including night shifts and overtime operations, as may be necessary to insure the prosecution of the work m accordance with the approved progress schedule. If, in the opinion of the contracting officer, the contractor falls behind the progress schedule, the contractor shall take such steps as may be necessary to improve his progress and the contracting officer may require him to increase the number of shifts, and/or overtime operations, days of work except Saturdays, Sundays and holidays, and/or the amount of construction plant, all without additional cost to the Government; provided, that the provisions of this paragraph shall not be construed as prohibiting work by the contractor if he so elects on Saturdays, Sundays and holidays.
*****
PART m. SPECIAL CONDITIONS
SC-1. COMMENCEMENT, PROSECUTION, AND COMPLETION.
(a) The contractor will be required to commence work under this contract within ten calendar days after the date of receipt by him of notice to proceed, to prosecute said work with faithfulness and energy, and to complete the entire work ready for use not later than 1,230 calendar days after date of receipt by him of said notice to proceed. The time stated for completion shall include final clean-up of premises.
(b) The contractor shall prosecute the various phases of his work in such a manner as to permit the start of operation of the main generating units (for testing purposes) not later than the following dates:

*****
SC-13. GOVERNMENT-PURNISHED PROPERTY. * * *
*312 (c) Equipment Delivery Schedules. * * *
(2) Main Unit Generators. — To be furnished and installed by the General Electric Company under Contract No. 'W’-40-058-eng-1339:

*****
SC-24. INTERFERENCE WITH OTHER CONTRACTORS.The contractor shall not interfere with material, appliances, or workmen of the United States or of any other contractor who may have work at this site. As far as practicable, all contractors employed by the Govermnent at or in the vicinity of the work shall have equal rights to the use of all roads, grounds and adjacent streams. In cases of disagreement regarding such use, the decision of the contracting officer shall govern.
* * * *
PART IV. TECHNICAL PROVISIONS
*****
5-13. BATCHING AND MIXING
(a) Equipment. — The contractor shall provide at the site of the work a modern and dependable batch-type mixing plant with a minimum capacity of 400 cubic yards of concrete in eight (8) hours. The plant shall include not fewer than two complete mixers with individual power plants and having a capacity of not less than one cubic yard each. The equipment shall be capable of combining the aggregate, cement, admixture, if usedj and water into a uniform mixture within the time limit specified and of discharging' this mixture without segregation. Tilting type mixers will be required for use where the concrete mixtures will contain a three (3) inch or larger size of coarse aggregate. Adequate facilities shall be provided for accurate measurement and control of each of the materials entering the concrete. Any waste resulting from faulty operation of batching equipment, over-batching of materials, or other causes will be charged to the contractor. The complete plant assembly shall include provisions to facilitate the inspection of all operations at all times. *313 All records and charts of the batching and mixing operation shall be prepared as required herein and shall become the property of the Government. The plant shall be subject to the approval of the contracting officer and shall conform to the following detailed requirements:
* * * * #
24-01. GENERAL.
(a) Transportation and Storage. — In addition to the equipment furnished by the Government under Sections XVI and XIII of these specifications, certain other mechanical and electrical equipment for the powerhouse and switchyard will be furnished by the Government under separate contracts. Equipment furnished by the Government will be delivered to designated points f. o. b. railroad cars. The contractor shall unload and transport all such equipment and materials from the railheads to the site of the work without delay, and store the equipment and materials until needed in the construction work using means satisfactory to the contracting officer for protection against the weather or other damage. The main unit generators will be installed and tested by the generator manufacturer and such work is not included in this contract. However, the unloading, hauling to the site of the work, storing until required and subsequent delivery of all generator parts and equipment to the generator manufacturer at the powerhouse is included in this section of work.
. Hi * # ❖ #
8. On November 22, 1949, the day following the return by the plaintiff of the signed contract, the defendant issued a written notice to proceed within ten days, which notice was received by the plaintiff on November 25,1949. Thereafter plaintiff had 1,230 calendar days to complete the contract, or until April 8,1953.
9. a. As of November 25, 1949, Jones-Wright was still working in the powerhouse substructure with men and equipment, but its progress was unsatisfactory to the defendant’s engineer who did not then expect the substructure would be completed prior to February 1950. The work left to be done was minor in character and consisted of cleaning, patching and repairing concrete and metal objects, removing a heavy accumulation of mud and trash, removing two derricks, a concrete hopper, air lines, construction rods *314 and piping, and testing drainage pipes. Even assuming ’ the readiness of plaintiff and a suitable access route to the substructure for the transportation of equipment and materials, it would not have been possible for plaintiff to have started on its work in the powerhouse substructure throughout the month of December 1949 because of its unfinished state and the conflicting activities of Jones-Wright.
b. On January 6, 1950, by which time 70 percent of the Jones-Wright cleanup work in the powerhouse substructure had been completed, a river flood occurred which overflowed into the substructure until January 10 and left it full of water and a subsided residue of mud and river debris. Jones-Wright had cleaned up the aftereffects of the flood by about January 24. A week later a new and more drastic flood occurred on January 31, with the river flooding into the substructure until February 7. Again Jones-Wright cleaned up the substructure from the flood effects, which took until about February 21, still leaving certain items to be done as described in finding 19 before plaintiff could commence its work. The two floods would not have justified a time extension to Jones-Wright because their occurrence was not an abnormal phenomenon during the winter months on the Cumberland Kivei*, and available hydrographic records would have caused one to anticipate from one to four floods of comparable proportions during the winter months. Jones-Wright neither requested nor received a time extension on account of these floods. During the flood periods it continued without interruption its contract work elsewhere on the dam. Jones-Wright had on several earlier occasions requested and received substantial time extensions for a variety of weather conditions, some of which were less severe in their nature and consequences than the floods here involved. The first flood made the substructure site inaccessible for contract work for about 18 days and cost Jones-Wright about $15,000 in cleanup costs. The second flood made the substructure site inaccessible for contract work for about 22 days and cost Jones-Wright about $20,000 in cleanup costs. Both floods submerged the switchyard area. If the switchyard area had been up to contract grade at the times concerned it would not have been submerged by the *315 first flood and would have been submerged about two days by the second flood. If plaintiff had been given possession of the entire worksite prior to both floods it would have suffered the same experience and unreimbursable cleanup costs in the powerhouse substructure as suffered by Jones-Wright. The powerhouse substructure was not ready until approximately March 15, 1950, for plaintiff to commence work.
10. a. As of November 25, 1949, Jones-Wright was building a concrete cable tunnel in the switchyard area and, until its walls neared completion, it would not be possible to back-fill the surrounding switchyard area to bring it up to the grade required by the Jones-Wright contract. As stated in finding 4, the most feasible route for an access road from the plaintiff’s campsite to the powerhouse substructure, over which all of the equipment, supplies and material needed for plaintiff’s contract performance in the powerhouse would be hauled, lay across the riverward side of the switchyard area between the cable tunnel and the river, part of the site which it was Jones-Wright’s obligation to backfill to required grade. The backfill had been sufficiently completed by April 1 to permit the plaintiff to start erection of the foundations for its concrete plant, but the part through which the plaintiff’s access road was to run was not brought to grade until mid-April. Plaintiff delayed in building its access road. The evidence indicates that it had not been started as of May 11,1950, and that it was completed June 2, 1950. The Contracting Officer in his March 16 letter to the plaintiff had .recognized the plaintiff’s need of an access road in the following language:
Access to the powerhouse substructure is now available above the cable tunnel for your use temporarily until the access road between the switchyard and powerhouse has been completed, and will be used jointly by you and the Jones-Wright Company as necessary. The need for a means of access between the switchyard and powerhouse is well recognized by this office and every reasonable effort is being made to complete the fill being placed by the Jones-Wright Company at the earliest possible date. However, it is desired to make a matter of record that the absence of this fill to plan grade has not *316 delayed your operations, and it is not expected that it will do so.
b. Throughout the period J ones-Wright, in the performance of its contract, had been using an access road running from the landward end of the dam and powerhouse to the switchyard area, skirting the inland side of the cable tunnel site most of the way. Over this road Jones-Wright’s vehicles hauled all materials and equipment needed in the construction of the cable tunnel as well as for completion of the dam. The materials, notably concrete, originated on the other side of the river where Jones-Wright’s concrete plant was located, were carried across the river via a high overhead cableway, and were unloaded at the powerhouse terminus of the Jones-Wright access road into waiting vehicles. Had the plaintiff had unobstructed use of this road it would have been a suitable alternative to the access road it eventually built across the other part of the switchyard area described in paragraph a above. However, the powerhouse end of the road could not efficiently accommodate a derrick for plaintiff to unload heavy machinery and materials into the substructure and, simultaneously, the loading of Jones-Wright’s vehicles from the overhead cableway. Nor was the road’s width adequate for concurrent use by the vehicles of both contractors. In short, the road could not have been shared efficiently by both contractors. Nevertheless, from the time the powerhouse substructure was ready for plaintiff to start work in, until the plaintiff completed its own access road on June 2, it must be concluded that plaintiff used the Jones-Wright access road jointly with Jones-Wright for all necessary purposes involving the hauling of equipment and supplies to and from the powerhouse, regardless of the inefficiencies entailed.
11. Either at the direction of or with the permission of defendant, plaintiff selected as its campsite (i. e., location of concrete mixing plant and temporary buildings such as office, warehouse, carpentry shop, etc.) an area adjoining the switchyard area. Part of the campsite, including the site for the concrete mixing plant, was to be, for purposes of efficient operation, in that part of the switchyard area which Jones-Wright was to bring up to grade. Most of the proposed campsite occupied adjoining land which it was *317 the contract obligation of Jones-Wright to level off with a bulldozer. Jones-Wright commenced to level off this latter area about February 17, 1950. The plaintiff voluntarily performed much of this grading in order to ready the site. At that same time defendant’s plans as to the location for the top of the riverbank under the Jones-Wright contract were unsettled, which in turn created a resulting uncertainty as to the precise location of plaintiff’s concrete mining plant and its cableway terminus which was to receive materials from across the river via a cable (not to be confused with the high cableway of Jones-Wright spoken of in finding 10 b). The fill in the riverbank side of the switch-yard area was finished on April 15, 1950, thus permitting plaintiff to place its power poles on April 17 for the purpose of stringing power cables across the river. As of May 31, 1950, the plaintiff had virtually completed this power installation. The sites for plaintiff’s carpentry shop and concrete plant were ready April 1, and plaintiff started erection of the former and excavation of foundations for the latter on April 3 and 6, respectively. The sites for plaintiff’s office, shop and one warehouse were ready earlier and those buildings had been built prior to April 1.
12. Plaintiff’s contract called for an exceedingly “tight” performance schedule during its first half for the following reasons. The plans provided for six generators, numbered 1 through 6 counting their positions from the landward side of the powerhouse. Each generator consisted of a stator surrounding a rotor. The stator was assembled on top of the completed turbine. The rotor was assembled on a specially designed pedestal in the assembly bay of the powerhouse and, when completed, was lifted into position on top of the completed turbine and inside the stator. Thus, before the stator could be assembled, and before the fully assembled rotor could be positioned on the turbine, the turbine and its scrollcase and penstock had to be completed. Paragraph SC-1 (b) of the specifications (finding 7) required that generators 6 and 5 be installed and ready for testing on August 19, 1951, and the remaining four generators at subsequent dates staggered through January 29,1953. Paragraph SC-13 of the specifications provided that the General Electric *318 Company was to ship the component parts of number 6 generator from the factory in October 1950 and of number 5 in February 1951. Accordingly, the plaintiff’s obligation under its contract was to have the turbine sites for generators 8 and 5 completed at such time as would enable the General Electric Company, by following a schedule geared to the tight schedule of plaintiff’s contract, to have both generators 6 and 5 assembled, installed and ready for testing on August 19, 1951. Beyond this plaintiff’s contract provided no precise completion dates for any of the turbine installations. In order to bring its contract to the stage of completion enabling General Electric Company to start the erection of generator 6, plaintiff would have to complete 50 percent of its overall contract. Any delay in the performance of this part of the contract would be serious.
13. Necessary preliminaries to the plaintiff’s preparation of the generator sites so that the generator erection could start involved, as to each generator, the installation of a penstock extension, a scrollcase, and a turbine, in that sequence. The penstock extensions, which were furnished by the defendant and were on hand from the beginning near the campsite area, weighed eight tons each and came in large sections which were to be fitted between the penstocks and the scrollcases. There were six penstocks, one per generator. Each penstock is in essence a metal' cylinder twelve feet in diameter through which water flows from the pool behind the dam under considerable pressure. At the point where the penstock projects into the powerhouse substructure it is coupled with another length of cylinder of the same diameter, known as the penstock extension, to the other end of which is eventually fitted a scrollcase. A scrollcase is a spiral waterway of converging aperture through which the water from the penstock is funneled onto the turbine blades, causing the same to rotate and turn a vertical shaft to which the superimposed generator rotor is attached. The revolution of the rotor inside the magnetic field of the surrounding stator produces electric current which, together with a current produced by the other generators, is run through a cable tunnel to transmission facilities in the switchyard for distribution to users. Thus the installation of the penstock *319 extensions was the first “pay” work (i. e., as distinguished from mobilization activities) to be started under the plaintiff’s contract.
14. In mobilizing for performance of the contract plaintiff was cognizant of the August 19, 1951, deadline for testing of generators 6 and 5, as well as the fact that the incomplete status of the Jones-Wright work in the powerhouse substructure and the switchyard area would effectively preclude a prompt commencement of work in those areas by the plaintiff. Plaintiff’s mobilization and work progress schedules had to be geared to these conditions. It is defendant’s theory that the time actually taken by plaintiff to mobilize for performance of the contract was normal for a contract of this type. It is plaintiff’s claim that it could and would have mobilized more rapidly had there been a prospect at the outset that the site would have been accessible at an earlier date. There is no standard length of time for mobilization under construction contracts. It depends on the nature of the contract, the adequacy of the period allowed for its performance, and other variable factors. Moreover, certain items of contract construction can proceed prior to complete mobilization if the contractor is sufficiently mobilized to commence those items.
15. On or about November 23, 1949, the plaintiff had prepared and furnished defendant a preliminary progress curve study with a request for comments so that a more formal schedule could be submitted to the Contracting Officer. The preliminary study provided for (a) a mobilization period of 130 days expiring April 4, 1950, (b) the first contract work to be done on the powerhouse substructure about March 5, 1950, and (c) the first contract work to be done leading to the installation of turbines and generators on April 5, 1950. It is reasonable to conclude that the period provided in plaintiff’s progress curve for mobilization was longer than would normally be required in a contract of the type in suit, and that the period for mobilization was influenced by:
(1) _ The incomplete status of the Jones-Wright operations in the powerhouse and switchyard areas as of the end of November 1949, and the lack of prospect for their completion in the immediate future.
*320 (2) Disinclination of plaintiff to take over the powerhouse site prior to the end of winter weather and the period when floods could be expected, even if the site had been available earlier.
16. The plaintiff ordered its reinforcing steel on November 25, 1949. On December 2, 1950, it described in a letter to defendant its mobilization activities, which included the establishment of a temporary office on the site and plans for a permanent office, opening of bank accounts, arrangements for such services as banking, telephone, electricity, water, railroad unloading facilities, cafeteria and housing facilities for personnel, and negotiations for contracts with prospective subcontractors and suppliers. By the end of December 1949 plaintiff had placed subcontracts or purchase orders covering all the electrical work, fabrication of structural steel, a Whirley crane, a concrete plant, and reinforcing steel. Promptly thereafter plaintiff placed subcontracts and purchase orders for cement, cement hauling, installation of piping and some mechanical equipment, air conditioning, and erection of structural steel.
17. On January 12, 1950, plaintiff’s superintendent Fry conferred with defendant’s engineers and wrote the following entry in his diary reflecting the conference:
Had evening conference with Gaines and Bowman. Told Gaines we would need area in which our work was to be done on or about March 1, 1950, in order to complete our plant set up. Gaines expressed opinion that J-W [Jones-Wright] would now make every effort to get Powerhouse cleaned out and turned over to us at earliest possible date. He also expressed opinion that switchyard area might be finished later than powerhouse. I told him I was not disposed to accept the powerhouse until such time as the work in the switchyard and the fill behind the training wall was sufficiently complete to allow us uninterrupted access. I said I felt that this access must be made available before we could be responsible for the powerhouse, as the powerhouse alone without'access thereto would be'useless. He agreed I had a good point and that every effort would be made to give us access.
18. In its letters of February 7 and 10,1950, to the defendant, the plaintiff described its arrangements for unloading and storage of government-furnished equipment at the rail- *321 head, its detailed plans for concrete plant and crossriver cable to supply aggregate for the same, and its revised work progress schedule then being prepared which planned:
a. Starting of concrete placement in late April 1950, to be 60 percent complete by August 1951.
b. Commencement of work May 1, 1950, on installation of penstock extensions 6 and 5 in the powerhouse, and work in the switchyard, the former to be complete by November 1,1950, and the latter to be 70 percent complete by August 1951.
c. Starting installation of turbines 6 and 5 in late August 1950, and completion of same in June 1951.
d. Starting structural steel erection in powerhouse August 1,1950, and completion November 1950.
With minor deviations, the foregoing schedule of planned activities is reflected in the work schedule bar chart prepared and furnished by plaintiff to defendant on or about February 10, 1950. Comparing this work schedule with plaintiff’s preliminary progress curve study prepared in late November 1949 (finding 15), the proposed dates for the mobilization period and the contract work commencement were both retarded approximately one month in the later schedule, probably reflecting to a large extent the effect of the January and February floods in the powerhouse substructure (finding 9) and the then anticipated delay in securing delivery of the concrete plant (finding 26).
19. a. By letter of March 1,1950, the defendant turned over to plaintiff for its use and responsibility the powerhouse substructure, explaining that the Jones-Wright work there was completed except for “the removal of certain items of piping and equipment and completion of numerous items of structural finish and repair”. There was also communicated orally to plaintiff’s engineer Fry on March 1 the contents of a telegram of that date from the Contracting Officer to defendant’s resident engineer complaining of plaintiff’s lack of progress and scheduling a conference on the following March 6. In its letter to defendant of March 3 the plaintiff protested the turning over of the substructure to it because the Jones-Wright work therein had not been completed and because the switchyard area had not been back-filled to grade to enable an access road to be constructed from *322 plaintiff’s campsite to the powerhouse (finding 10 a). The plaintiff also complained in this March 3 letter that Jones-Wright’s failure to grade the campsite area was delaying plaintiff in the erection of its shops and warehouses, and further that Jones-Wright’s failure to backfill the river bank next to the training wall had caused plaintiff to select a different site for its concrete plant, cableway and carpenter shop than it had originally planned. The letter stated at one point:
Due to your failure to complete certain work it is impossible for us to perform the essential preliminary phases of our operation.
b. This March 3 letter was plaintiff’s first written complaint to the defendant that it had been delayed in performance of its contract by reason of having had no access to the worksite. Nor had the defendant up until then criticized plaintiff for its lack of progress. It has not been proved that there were any oral complaints prior to March 3.
20. Pursuant to the direction of the Contracting Officer in his telegram of March 1, 1950, a conference was held on March 6 attended by the Contracting Officer and engineers for both plaintiff and defendant to discuss the status of plaintiff’s contract performance. There it was disclosed by the Contracting Officer that the Government had made binding prior commitments to Tennessee Valley Authority and the Atomic Energy Commission for an early supply of power from the Wolf Creek installation, and that no delay in the original generator completion dates specified in the contract could be permitted. The Contracting Officer charged that plaintiff was behind schedule, gave it a proposed revised work schedule, and directed the plaintiff to submit one to conform thereto. The revised work schedule required plaintiff to have the site ready to commence the erection of generator 6 by October 15, 1950, which would allow a period of 10 months from then to August 19, 1951, for General Electric Company to assemble and erect, ready for testing, generator 6. Since, as pointed out in finding 12, plaintiff would have to complete 50 percent of its total contract in order to have the site for generator 6 ready for General Electric Company to commence assembly of that gener *323 ator, tbe plaintiff was faced at the March 6 conference with an extremely tight schedule which could be met, if at all, only by working extra shifts and overtime. Had the Contracting Officer at that time determined to expedite the General Electric Company work schedule by authorizing extra shifts and compensation, which was eventually done, the October 15, 1950, deadline imposed on plaintiff would not have occurred, and the General Electric Company work would have been scheduled to start in the spring of 1951. In fact the site was not ready until May 1,1951, for General Electric Company to start erection of generator 6. The generator was erected and ready for testing on September 19,1951.
21. On March 18,1950, plaintiff submitted under protest its revised work schedule as directed by the Contracting Officer. In its letter to the Contracting Officer of that date the plaintiff analyzed carefully the necessary timetable for the accomplishment of construction items necessarily prerequisite to the erection of generator 6, and recited in detail the reasons why the site could not be ready for starting the erection of generator 6 before April 1951, which, according to plaintiff, would still leave 4% months for the generator to be assembled and installed ready for testing by the contract date of August 19, 1951. As shown in finding 20, the site was, in fact, not ready until May 1, 1951 and the testing was not done until September 19,1951.
22. Each generator consisted of thousands of parts which General Electric Company shipped to the worksite and assembled there with workcrews. The parts for the rotor were cleaned and then assembled on a special erection pedestal situated in a large assembly bay at the landward end of the powerhouse about 40 feet above the draft tube floor (i. e., generator floor). The completed rotor was 26 feet in diameter, weighed about 250 tons, and, when completed, was carried into position on the top of the turbine by a massive overhead crane running the length of the powerhouse. There was room in the assembly bay for the erection of only one rotor at a time. It would conceivably have been possible to construct a temporary erection pedestal on the generator floor at the landward end of the powerhouse so *324 that two rotors could be assembled simultaneously, but it would not have been an efficient operation and it was not done. While the rotor was being assembled, the stator within which it was designed to rotate was being assembled simultaneously on top of the completed turbine. The order of erection of the successive units was overlapped, so that when the first rotor was fully assembled and positioned on the turbine, the erection pedestal was free to commence the assembly of the next rotor. While the parts for the second rotor were being cleaned and assembled on the erection pedestal, another crew was busy completing the many details necessary at the first generator site to ready the first generator for testing, while still other men were presumably engaged in assembling the stator for generator 5. It was thus a continuous operation, but the work could not move at a more rapid rate than permitted by the time taken for the assembly of the rotor on the single available erection pedestal. The normal time for the complete assembly and erection ready for testing of generators 6 and 5 would have been nine months, assuming a one-shift operation and a 40-hour workweek, as contemplated by the General Electric Company contract. However, since the total project was considered to be behind schedule, the defendant by later change order involving extra compensation had General Electric Company institute a two-shift operation, each shift working a 48-hour, six-day week, resulting in the assembly and erection ready for testing of generators 6 and 5 in five months. The record offers no reason to believe that General Electric Company was not efficient and reasonably prompt in its performance, or that another contractor could have performed more rapidly.
23. At conferences with the Contracting Officer on March 27 and 28, 1950, the plaintiff’s representative agreed at the Contracting Officer’s insistence, to try to have the site of generator 6 ready to start generator erection on December 1, 1950, instead of October 15, so that the generator could be completed ready for testing April 17, 1951, although it was not to be actually tested until it could be done in unison with generator 5, which was to be ready for testing August 19, 1951. This schedule was approved and confirmed by *325 the Contracting Officer’s letter to plaintiff of March 29,1950. On the same day the Contracting Officer informed the TYA that the construction schedule was “extremely tight” but assured it that all concerned would “do everything possible to adhere to the program.”
24. On April 28,1950, the Contracting Officer advised the plaintiff by letter that he had determined that the contract required the plaintiff to have the six generator sites ready for the start of generator erection on the following dates which are quoted from the letter with other relevant passages, as follows:

You are herewith advised that under the authority of paragraph GC-5 (a) of the contract specifications, the Contracting Officer has determined that the above dates for starting generator erection are required under the contract and that you were informed of the necessity for such dates in conference in this office on 6 March 1950. Further, you are advised that.under the authority of paragraph GC-5 (b), the Contracting Officer has determined that, in his opinion, your work has fallen behind the required progress schedule, and you are herewith directed to improve your operations, including the increase of construction plant, as may be required to meet the above dates for start of generator erection, all without additional cost to the Government.
V $ «ft
In your letter of 14 April 1950, receipt of which is acknowledged herein, you state in part: “The program * * * disregards time extension to which we are entitled under Article 9 (c) of the contract.” You are advised that the Contracting Officer is not aware of any -delays to your work to date for which it has been established that you are entitled to a time extension under Article 9 (c) of the contract; therefore, no consideration caribe given to time extension in setting contract work schedules at this time.
By this foregoing letter the date for the start of erection of generator 6 was accelerated to October 15, 1950, instead of December 1, 1950, as had been directed by the Contracting *326 Officer on March. 29, 1950 (finding 23). In the same letter of April 28 the Contracting Officer also advised plaintiff that he wanted to accelerate the contract testing dates for generators 4, 3,2 and 1 by from one to 2% months, for which plaintiff was to be paid additional compensation.
25. On May 4,1950, the Contracting Officer disapproved by letter plaintiff’s progress schedule submitted on March 18, because it contained a protest and a reservation of rights to claim a contract adjustment for expediting the work involved in meeting the proposed schedules, and the plaintiff was directed to furnish a new schedule which would comply with instructions. On May 17,1950, the plaintiff submitted to the Contracting Officer a new schedule, still under protest, and a letter explaining why the schedule was unrealistic and at variance with contract requirements. The letter reasserted plaintiff’s previous claim for an adjustment of the contract price.
26. In the meantime the concrete plant ordered by the plaintiff on December 23,1949 (after being denied permission by defendant, and properly so, to convert a different type of concrete plant that was available to plaintiff nearby), was delayed in delivery due to a strike which resulted in the plant being placed in operation June 6,1950, instead of May 1 as planned. In October 1950 the Contracting Officer gave plaintiff a 37-day time extension to cover this delay, running from May 1 to June 6. If plaintiff had needed concrete it could have been purchased from Jones-Wright which had excess capacity. On May 3, when plaintiff for the first time actually needed concrete, it applied to defendant for permission to buy concrete from Jones-Wright, and secured tentative approval on May 16. It is reasonable to believe that the reason it did not proceed to purchase concrete from Jones-Wright after May 1 was that, by the time it secured defendant’s tentative permission, its own plant was almost ready.
27. The 37-day extension granted plaintiff in October 1950 because of the concrete plant delay resulted in plaintiff’s submission in November 1950 of a revised work schedule reflecting the effect of the delay. Although the revised work schedule established April 7, 1951, for the start of generator 6 *327 erection by the General Electric Company (instead of October 15, 1950, which was the outstanding requirement), it seemed unlikely that this could be met on a normal shift and workweek basis. This matter was discussed at a conference held between the parties on January 11, 1951, the Government’s minutes of which conference read in part:
* * * Colonel Walsh [the successor Contracting Officer] stated that up to the present, the job had been run mainly with an eye for economy instead of completion date, and that since the Corps of Engineers had commitments to Tennessee Valley Authority and Atomic Energy Commission that the power would be furnished by 19 August 1951. It was mandatory that the project be gotten back on original schedule.
On January 20,1951, the Contracting Officer informed plaintiff that it was behind the approved progress schedule, and directed plaintiff to institute “a five-day work week on three shifts, overtime operations, and increased construction plant, all without additional cost to the Government.” The plaintiff acceded to this direction in writing and under protest.
28. Eventually, by means of employing additional shifts and working overtime, the contract was completed on March ' 24, 1953, 14 days ahead of schedule. During the performance of the contract a number of change orders were issued and supplemental agreements entered into in connection with plaintiff’s performance of the contract. In general, the change orders and supplemental agreements paid plaintiff additional compensation for accelerating its performance in order to make up for delays occasioned without plaintiff’s fault subsequent to April 1950 and in order to meet the dates originally fixed by the contract for the testing of the generators and completion of the contract. The change orders and supplemental agreements were not related to the plaintiff’s instant claim, which was specifically reserved. Plaintiff asserts in this action that it incurred extra costs and expenses aggregating $596,639.09 in complying under protest with the orders and requirements of the defendant, over and above what the cost of the job would have been had the Contracting Officer granted plaintiff’s request for a time extension to offset the 126-day initial worksite delay.
*328 29. On several occasions during the performance of the contract the plaintiff filed claims with the Contracting Officer for a 126-day time extension and/or an equitable adjustment in the contract price based on the denial or access to the worksite during the first 126 days of the performance period from November 25, 1949, through March 31, 1950. These claims were denied by the Contracting Officer and plaintiff duly appealed to the Corps of Engineers Claims and Appeals Board. The Board, after a hearing, denied plaintiff’s claim on April 13,1954. The complete administrative record is in evidence in the instant case.
30. The formal findings of the Contracting Officer which amplified his May 17, 1950, denial of plaintiff’s claim for a 126-day time extension due to worksite delays, were made on May 29, 1951. Portions of the latter which relate to the worksite delay, and which must be subjected to the test of whether they were arbitrary, capricious, so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence in the record before the Board, are as follows:
RINDING OR PACT
Alleged Delay by the Government in making site available to Contractor
27. Contractor by letter of 8 May 1950, requested an extension of time because of an alleged delay in making available the site for his construction plant, and the powerhouse substructure, and reserved the right to claim additional compensation because of the alleged delay. (Letter of 8 May 1950 is appendix 15 to Exhibit B)
28. By letter of 17 May 1950, the then contracting officer, A. W. Pence, Colonel, Corps of Engineers, denied contractors request for extension of time. (Appendix 20 to Exhibit B.)
29. By letter of 5 March 1951 the undersigned forwarded to the contractor a findings of fact in support of the above referenced decision. The findings of fact are also signed by the undersigned, Henry Walsh, Colonel, Corps of Engineers, as successor contracting officer. (Exhibit G and H.)
30. A brief restatement of the pertinent facts concerning the progress of the work from the date of the notice to proceed to the actual start of concrete work on the powerhouse, the first actual work scheduled *329 other than the erection of penstock (or scroll case) extensions which would contribute to the forward progress of the construction of the powerhouse, is contained in the following paragraph.
31. The contract No. DA-40-058-eng-29 is dated 3 November 1949. The notice to proceed, issued in accordance with the terms of the contract is dated 22 November 1949 and was received by the contractor on 25 November 1949, thus fixing the date for commencement of work as no later than 5 December 1949.
32. Contractor, by his letter of 2 December 1949 (Appendix 26 to Exhibit D) reviews his accomplishments since receipt of notice to proceed. These consisted chiefly of planning operations, determination of equipment needs and start of negotiations for procurement of major subcontracts.
33. On or about 9 December 1949 the contractor was furnished a plat or sketch of the area he had indicated would be preferable to him as a work site. The plat showed the approximate finish grades that would be required of the contractor for the dam, Jones, Wright, Contract No. W-40-058-eng-249. It is believed that the original sketch was given the contractor for his use in planning locations of buildings and other facilities.
34. By letter of 1 March 1950 the powerhouse substructure was turned over to the contractor, who by letter of 3 March 1950 protested such action. The then contracting officer Colonel A. W. Pence, by letter of 16 March 1950 reviewed the conditions of the site and outlined the responsibilities of the contractor, who, by letter of 4 April 1950, advanced additional information concerning the condition of the site. The further action of the contractor and contracting officers is as set forth in paragraph 27 to 29 above. Letters referenced are appendices 16, 17, 18 and 19 to Exhibit B.
35. Paragraph SC-24 of the specifications states in pertinent part as follows:
“As far as practicable, all contractors employed by the Government at or in the vicinity of the work shall have equal rights to the use of all roads, grounds and adjacent streams. In cases of disagreement regarding such use, tlie decision of the contracting officer shall govern.” [Emphasis supplied.]
36. As stated in paragraph 26 above, contractor ordered on 23 December 1949 a complete concrete mixing plant. The purchase orders as accepted by the supplier called for shipment of the last portions of the plant by *330 •13 March 1950. As stated in paragraph 26 above, the last delivery of parts for the plant were received on or about 15 May 1950. Contractor requested an extension of contract time, was granted 37 days by Change Order No. 2, and has accepted the change order. Contractors’ letters of 17 May 1950 and 7 August 1950 (Exhibits J and K) requesting the additional time and stating the periods of delay show that the time granted by Change Order No. 2 is concurrent with that alleged as delay because of the conditions of the site.
37. Contractor by letter of 3 May 1950 (Exhibit “O”) referred to correspondence concerning the delay in delivery of the concrete mixing plant and Whirley crane and stated “These delays in delivery of concrete mixing and placing equipment have resulted in our being delayed in the completion of our plant set-up. In order to obviate or at least minimize (sic) the effects of these delays on the work as a whole, we propose to purchase concrete from the Jones-Wright Company, beginning immediately and continuing until such time as our plant is in full operation —”.
The letter continues with the proposed arrangements for obtaining accounting and paying for cement, aggregate and use of plant. By letter of 16 May 1950 (Exhibit P) permission was granted contractor to obtain concrete from the Jones-Wright Company, however, no concrete was obtained in this manner.
38. Letter of the Resident Engineer to the District Engineer dated 11 May 1950 (Exhibit Q) contains the record of construction of the contractor’s work area facilities and the dates on which such facilities were put into use, where the date was prior to the date of the letter. Contractors’ letters of 4 April 1950 and 8 May 1950 referred to are appendices 15 and 19 to Exhibit B.
39. Progress on the erection and calibration of the machinery and equipment of the concrete mixing plant continued until the first concrete was produced on 6 June 1950 and was placed in the lowest portion of the powerhouse.
From the foregoing facts I find:
(a) As to contractor’s request for additional time for completion due to alleged failure of the government to make the site available to the contractor, that the contract provides that all contractors shall have equal rights to the use of all roads, grounds, and adjacent streams, and that in case of disagreement regarding *331 use the decision of the contracting officer shall govern; that the site of the work, was turned over to the contractor on 1 March 1950; that the contractor had occupied at least a portion of the site prior to 1 March 1950; I further find that during the period of claimed delay contractor was awaiting delivery of essential equipment purchased by him; that delivery of the equipment was delayed by a strike for which contractor has requested and has been granted an extension of time; that this delay to equipment actually governed the constructive start of the project; and that the contractor was not delayed and is due no additional time for completion or additional compensation because of alleged delay in making the site of the work available to him.
31. The portions of the Board’s findings and decision of April 13, 1954, rejecting plaintiff’s appeal and affirming the Contracting Officer’s denial of plaintiff’s claim for work-site delay are as follows:
Appellant further claims that it was delayed a total of 126 days by reason of delay on the part of the Government in making the site available between 25 November 1949 (date of receipt of notice to proceed) and 31 March 1950, the date the essential portion of the site was made completely available; that performance of work was prevented until 31 March 1950 due to operations of the Constructor of the dam in and adjacent to the powerhouse substructure; that appellant was entitled to an extension of time under Article 9 (c) of the contract to cover the delay, and that the contracting officer erroneously denied a request for such time extension. The pertinent provisions of Articles 3 and 9 of the contract referred to above are quoted below.
$ * * ‡
In denying claim for extension of time for 126 days the contracting officer found that appellant had not asserted any excusable causes for not performing work in the building area until 31 March 1950 and that the work site was at all times available after receipt of notice to proceed on 25 November 1950.
*****
By letter of 3 March 1950 appellant declined to accept responsibility for the powerhouse construction site stating that no prior inspection had been made by the Government and the contracting officer of the powerhouse site; that the contractor, constructing the dam and *332 the substructure of the powerhouse was still working in the area; and that grading had not been completed which prevented access to the constructing shops, warehouses and general camp site. Appellant also disclaimed any responsibility for keeping the area un-watered for the benefit of the dam constructor. Appellant further protested that the existing access road used by the dam constructor was not adequate, principally because of interference by the other contractor.
The contracting officer replied under date of 16 March 1950 that appellant was not responsible for unwatering any area for the convenience of the dam constructor, but that appellant was obligated to carry on its operations in areas jointly and concurrently with other contractors working in the same areas. The contracting officer further took the position that at no time had appellant been prevented from entering the areas and performing such work as was necessary to carry on its operations. Paragraph SC-24 of the specifications relied on by the contracting officer is quoted below:
* * * * *
Notice to proceed was issued on 25 November 1949. However, except for bringing a tool wagon onto the site within ten days thereafter for use as a temporary office, the testimony of a representative on behalf of the Government indicates that on 28 April 1950 some work had been done on the camp site, but that no actual construction work had been performed. * * * The same representative further testified that as late as 31 May 1950 appellant had not completed mobilization for actual constructive work. * * * Appellant was engaged principally during the period 4 November 1949 until 31 May 1950 in mobilization and preparing the camp site.
The record shows that delay was experienced by appellant in the delivery of its batching plant. The final pieces were delivered on or about 1 June 1950. Because of this delay due to strikes an extension of time of 37 days was granted for the completion of the contract.
* ❖ * *
DECISION
% $ # $ %
With reference to appellant’s claim of nonavailability of the work site, Paragraph SC-1 (a) required appellant to commence work within ten days after notice to proceed and to complete the work not later than 1,230 days after receipt of such notice, thus establishing 8 April *333 1953 in the regular course as the date for completion. All work was completed and accepted on 24 March 1953.
Although appellant moved a tool wagon onto the site within ten days after receipt of notice to proceed (25 November 1949), the uncontroverted testimony of a representative on behalf of the Government is that the contractor was not prepared to start construction on 31 May 1950. Actually, it appears that final pieces of its batching and mixing plant were not delivered until as late as 1 June 1950.
It also appears to be uncontested that two high water stages occurred during the period 25 November 1949 to 31 March 1950 covering appellant’s request for extension of time of 126 days. Because of these high water conditions, together with the necessity of organizing the job including mobilization of equipment appellant apparently elected not to take active possession of the site at a date earlier than 31 March 1950.
Testimony by a representative of appellant is to the effect that had the site been made available without interference equipment could have been brought in and operations commenced within two or three weeks after notice to proceed and mobilization built up from that point.
A representative of the Government in response to a question concerning a reasonable time to mobilize answered as follows:
“* * * I would not become concerned over a contractor’s progress for a period of four to five months allowance for mobilization time before he actually started work to amount to anything. In other words, I wouldn’t be worried if he took four to five months for mobilization. * * *”
Much testimony was had relative to appellant’s claim of interference by the dam constructor within the powerhouse substructure; failure to obtain possession of the switchyard portion of the site; failure of the dam constructor to bring the area adjacent to the switchyard up to grade; and inability to bring heavy equipment and supplies over the existing access road. The record discloses, however, that appellant was afforded equal rights with other contractors in accordance with Paragraph SC-24 of the specifications, referred to above, concerning the use of roads in the vicinity and that at no time prior to the Resident Engineer’s letter of 1 March 1950, did appellant request access to the site or protest against undue interference by other contractors. The record further establishes that appellant was not prepared to *334 perform any work in the switchyard area and was apparently not damaged by reason of this portion of the site not being brought up to grade by the dam constructor.
$ '!•
The Board further finds that the work was behind schedule on 1 March 1950 and that the direction of the contracting officer to speed up the work to bring it up to schedule was in accordance with the provisions of the contract,’ that appellant’s claim for extension of time from 25 November 1949 to 31 March 1950 (126 days) was due to delay in securing concrete plant and failure by him to put the site in operating condition until approximately 31 May 1950; and that the additional equipment brought onto the site was necessary in the regular operation of the contract work, and that appellant therefore is not entitled to reimbursement for such plant rental.
32. The plaintiff was not deprived, by the negligence or other fault of the defendant, of the opportunity to do, in the performance of its contract, work which it was ready, willing and able to do.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover and its petition is therefore dismissed.